Brockenbrough, J.
William, Black the el d er died in 1782, having previously made his will. On the con *476 struction of the first and seventh clauses of that will if depends whether the plaintiffs had at any time a right to the relief which is asked by the original bill.
The first question discussed at the bar is the proper construction of the first clause, on which it is supposed the seventh is dependant. The testator, as before stated, died in 1782; his grandson William, the principal devisee died in October 1783, an infant of only-two or three years of age, and his son William also died in October 1784, without leaving any son or daughter, and wilhout having had any other child than the said William. The devise of the land to his second and third sons, and to his daughters, was wholly inoperative, there having been no such persons in existence. The only question under the first clause is, did the grandson William ever take the land devised by it? The legal estate was never vested in him. The land was devised in fee to Blair and Lyons, but the same clause declares the trusts for which they are to take and hold it. Those trusts are that they or their heirs, or the survivors of them, shall convey the land in fee to the grandson William on his attaining the age of 21 years, and that in case of his death before that age, without having issue, then (after the aforesaid intermediate inoperative devises) the said trustees shall hold it in trust for the right heirs of his son William in fee simple. Was William, the grandson ever vested with an equitable estate in the land ?
I am very strongly inclined to the opinion that such an estate in remainder did vest in William the grandson, at the moment of the death of the testator, subject however to its being divested in favour of the devisees over, on the said grandson’s dying before the age of 21 without issue. In Boraston's case, 3 Co. 19. the devise was “ to Thomas Ambrey and A. his wife for eight years next after my decease ; after that term, to remain to my executors until such time as HughBoraston shall accomplish his full age of 21 years, and the mesne profits to *477 be employed by my executors towards the performance of my will; and when the said Hugh shall come to his age of 21 years, then I will he shall enjoy the land to him and his heirs forever.” Hugh Boraston died at nine years of age. It was resolved that these adverbs of time, when and then, did not make any thing necessary to precede the settling of the remainder, and that they expressed the time when the remainder to Hugh should take effect in possession, and not when it should become vested. Accordingly it was adjudged that the heir of Hugh should hold the land (into which he had entered a.t the time when Hugh would have attained his age) against the heir of the testator.
A similar decision was made in Doe e. d. Hayward v. Whitby, 1 Burr. 228. The testator had devised lands to II. and B. and the survivor in fee, in trust to lay out the profits in support of his nephews Thomas and John Hayward during minority, and when and as soon as they should respectively attain their ages of 21, then to the use of the said Thomas and John and their heirs, equally. The nephew Thomas died under age and without issue; and in a controversy between the heir of the testator, and John who was the heir of his brother Thomas, the court decided that this was an immediate gift to the two nephews, with a trust to be executed for their benefit during their minority; and that Thomas’s arriving of the age of 21 was not a precedent condition to the vesting of the estate in him. In this case lord Mansfield made these striking remarks—“ Here, upon the reason of the thing the infant is the object of the testator’s bounty, and the testator does not mean to deprive him of it in any event. Now suppose that this object of the testator’s bounty marries and dies before his age of 21, leaving children; could the testator intend in such an event to disinherit him ? Certainly he could not. And as to the testator’s heir at law, he is only to take what the testator has not devised away from him.”
*478 The case of Hunt v. Moore, 14 East 601. was one of an immediate devise, in which it was decided that a devise to A. in fee when he attains the age of 21 years, and if he dies before he attains the age of 21 years, then over, does not make the devisee’s attaining 21 a condition precedent to the vesting án interest in him, but it is a condition subsequent, on which the estate is to be divested: and the court said it makes no difference whether the devise be of a remainder, or an immediate estate. See Fearne 294. where the author lays down the above doctrine, and refers to the above cases and that of Mansfield v. Dugard, 1 Eq. Ca. Abr. 195. See also Fearne 547-8.
In the case before us, there is a clear implication that if the grandson should die within age leaving issue, that issue shall have the estate; for after providing that the trustees shall convey to the grandson on his attaining 21, it goes on to declare that “ in case of his death before that age without having issue,” then devise over; by which it is necessarily inferrible that if he leaves issue within age, that issue shall take. I do not see how such issue can be provided for in the way intended, unless we adjudge that the equitable estate in remainder is to vest immediately in the grandson. If it vests in him, then the issue takes by inheritance, but if it does not so vest, then the issue can only take by purchase, if at all. Thus we see that the very case which lord Mansfield put in Hayward v. Whitby might have occurred here.
The counsel for the appellee, however, drew a distinction between executed and executory trusts, of which latter this is said to be one. It is true that something remains to be done to complete the title of the devisee grandson, but that something is to convey the legal title. The distinction between the two kinds of trusts, I apprehend, regards not the time when the legal estate is to be conveyed to the cestui que trust, but the quantum of interest which is to be conveyed. Thus (to take one ex *479 ample out of many) in lord Glenorchy v. Boswell, Ca. Temp. Talb. 3. the devise was to trustees in fee, in trust that if Arabella lived to marry a protestan! &c. then the trustees were to convey to her for life without impeachment of waste, remainder to the husband for life, remainder to the issue of her body &c. and the question was whether the cestui que trust took an estate for life only, or an estate tail. Lord Talbot took the distinction between trusts executed, or immediate devises, and trusts executory. In the former, he said, the testator supposes no other conveyance will be made, but in the latter he leaves somewhat to be done, the trusts are to be executed in a more careful and more accurate manner. Whilst he admits that if it had been a trust executed, the devisee would have had an estate tail, yet as it was a trust to be executed, he decreed that she should have an estate for life only, with remainder &c. No queslion arose whether an equitable estate devised to her (whatever might be its quantity) vested immediately in her, or whether it did not vest till her intermarriage with a protestant. In our case that question does arise, and whilst the legal estate passed to Blair and Lyons the trustees, I see no reason why the equitable estate should not pass by the devise to the grandson, no action on the part of the trustees being necessary to complete that equitable estate.
And as to the time w'hen the conveyance was to be made to the grandson, we may easily imagine a case in which a court of equity would have required the trustees to execute that trust before his coming of age. One of the trusts declared by this same first clause is, that the trustees would permit the widow to occupy a moiety of the Falls plantation, and receive the profits to her own use during life or widowhood. Suppose this life estate to terminate whilst the grandson was within age; why should not the trustees convey to him immediately ? The profits of that moiety would then be held in trust *480 for him, and I can see no ground on which they could withhold" from him the possession of the land itself.
If I am right in this matter, it seems to follow that the equitable estate in the land, which was vested in b]tri> devolved on the devisees over, on his death in 1783.
Now let us turn to the seventh clause of the will, and ascertain its operation, first on the slave property. The slaves were devised by that clause to the grandchild or children who should take the land, and as that was William Black the before mentioned grandson, the question is, who inherited them from him at the time of his death? By the act of 1705, 3 Hen. stat. at large 333. slaves were declared to be real estate sub modo, and descended unto the heirs and widows of persons departing this life, according to the manner and custom of lands of inheritance held in fee simple ; but they were liable to the payment of debts, and might be taken in execution as chattels or personal estate. Although they descended to the heir, yet all of them except the widow’s dower were to be inventoried and appraised, and the value thereof divided equally amongst all of the children, and the younger children might maintain an action on the case (afterwards exhibit a bill in chancery) against the heir.
Who was the heir of the infant William Black ? Not his father, for lands could not then lineally ascend. His father had two sisters, Mrs. Hardiman (afterwards Mrs. Hayes, one of the plaintiffs) of the whole blood, and Frances T. Black (who afterwards intermarried with Garland) of the half blood. Mrs. Garland was of course of the half blood to the infant William Black the grandson, and could not inherit from him. Mrs. Hardiman was therefore his sole heir. She had a right to the slaves, unless they were necessary for the payment of debts. The executors took possession of them for that purpose. If they were not necessary to pay the debts *481 of the testator, she might have sued for them immediately after the death of the infant William, Black. At that time it does not appear she laboured under any disability ; she has not so stated it, and it cannot be presumed. In 1782 it appears that she was an adult, for she then executed her bond to the executors for purchases at the sale ; and she was a feme sole, for she did not marry Hayes till some considerable time after her father’s death.
As to the bequest of the stocks of cattle, horses &c. under the said seventh clause, to the said William, the grandson, they devolved not on his heir as such, but on his next of kin by operation of the act of 1748. 5 Hen. slat, at large p. 444. No claim has been set up to any part of that distributable estate, except by Mrs. Hayes and the widow of the testator William Black. For a distribution of such personal estate, the next of kin might have sued the executors in a reasonable time after the death of William Black the grandson.
And here arises the most important question in this cause, namely, Avhether there has not been such laches on the part of Mrs. Hayes and the other plaintiffs in the cause as Avill operate an equitable bar, from the great lapse of time, to their recovery in the present case. This suit Avas instituted in 1809, a period of 26 years after the death of the grandson. If we are to pay due respect to the decision of Carr v. Chapman, 5 Leigh 164. I am of opinion that under all the circumstances of this case, wo must hold the plaintiffs to be barred by time and their own neglect. I will not, hoAvever, dwell on this subject, but content myself with referring to the observations of our brother Carr on this point of the case, in which I entirely concur.
I will further remark, that in this view of the case the laborious discussion at the bar, and our own remarks on the construction of the first clause of the will, have turned out to be more a matter of curiosity than *482 of use. For admitting that no equitable estate vested in William the grandson, the testator must have died intestate as to the slaves and personalty. In this aspect, the slaves descended upon William Black the son, who, as heir of his father, might have sued for them before his death in 1784; and the younger children of the testator, namely, Mrs. Hardiman and Frances T. Black, might have convented the heir and the executors before the court, for the purpose of recovering their share of the appraised value of the said slaves, at the same early period. So, too, the son and the two daughters might at the same time have sued the executors for a distribution of the chattels contained in the seventh clause, and for an account of their administration. But this claim has not been set up until the filing of the amended bill in 1824, more than forty years after the suit might have been brought. The same remark may be made as to the stale claim, never brought forward till 1824, to have the land relieved from the mortgage debt, for the purpose of reimbursing Mrs. Hayes the amount paid under the decree of foreclosure.
On the whole, I am of opinion that the decree dismissing the bill ought to be affirmed.
Carr, J.
I am of opinion that the decree of the chancellor dismissing the plaintiffs’ bill should be affirmed. My reasons for this opinion I will assign as briefly as I can. William Black died in the early part of the year 1782. He left a widow and three children, a son William Black, and two daughters Mrs. Hayes and Mrs. Garland, and a grandson William Black, the son of William. He died possessed of a large property real and personal. He left a will, appointing many executors, of whom only two Robert Goode and Turner Southall qualified; Goode in April and Southall in June 1782. In the course of the same year the executors had large sales of the personal estate and slaves; and *483 in 1783 and 1784 more slaves were sold. In 1783 William Blade the grandson, the chief object of the testator’s bounty, died, a child of two years old. In 1784 died his father William, Black, the heir at law of the testator, but to whom it was the evident intention of the will to give nothing, while it provided for the comfortable support of himself and family. Soon after the qualification of the executors, Mrs. Black the widow renounced the will, and filed her bill for the assignment of dower in the slaves, and her share of the other personal estate, alleging that the executors had refused to assign her dower in the slaves and other personalty, on the ground that the debts of the estate would absorb the whole. The executors in answer admit the widow’s title, and refer to the inventory of record, which shews the appraised value of the property to be £ 6749. 10. but they say that debts have come to their knowledge amounting to £ 6000. nearly, and therefore they have felt unsafe in assigning slaves &c. without receiving the indemnity of a decree of the court. They aver that there will not be assets for paying the debts, without the sale of a number of the slaves. This was in September 1782, before any of the slaves were sold. And the court at the same date make the order for assignment ; but subject the widow to give bond and security in £ 4000. to indemnify the executors against the claims of the creditors. Southall, from the time of his qualification in 1782, to his death in 1792, was the acting executor; Goode doing almost nothing after 1782. Soon after Southall’s death, his executor in February 1793, under an order of court, settled with commissioners the account of his executorship on Black’s estate; and he falling in debt £ 35. 15. 5£. his executor paid that sum soon after to the surviving executor Goode. About the same time large claims both at law and in equity were brought against the estate, and recoveries had for heavy sums, amounting (it would seem) to upwards of 14,000 *484 dollars. In the year 1793 too, a bill was filed against Hayes and wife, to foreclose a mortgage which the testator had given on the Falls plantation, and which place, after the death of William Black the grandson and Wil^am Black the son, had come to the possession of Mrs. Hayes as heir of her brother. This bill states that the executors of Black (as the plaintiff is informed) have no assets to pay the debt; and this statement, if not admitted by the answers, is certainly not denied, nolis any call made for the personal estate to be brought in ease of the land, though the defendants seem to have struggled hard on other grounds to save the land; but in vain; for a decree passed to foreclose, and the land was sold, not by an officer of court, but by the parties themselves, to satisfy the decree. The decree of foreclosure passed in 1797. In 1808 (I believe) Robert Goode the surviving executor of W. Black died. In 1809 the bill which forms the first in the series to be found in this record, was filed by Anne D. Hayes the daughter, and Claiborne and wife (which last had been the widow of William Black the elder) against Richard Goode and Francis Goode, administrators with the will annexed of Robert Goode deceased, who was surviving executor of William Black the elder deceased; Samuel Goode a surety for the said Robert Goode as executor of the said William Black; Feyton Southall and Jolm Baingerfield executors of James Southall deceased, a co-executor with Stephen Southall (whom he survived) of Turner Southall deceased, who was an executor of the said William Black deceased ; and George Markham and Mary Markham executor and executrix of Bernard Markham deceased, and Thomas Flarris executor of the said Francis Goode deceased, which said Bernard Markham and Francis Goode were sureties for the said Turner Southall deceased, as executor as aforesaid. This bill is filed twenty-seven years after the death of the testator, and seventeen after the death of the most active *485 executor, and sixteen after the settlement of his accounts,—after the death too of the surviving executor,— against eight persons, some of them three removes off, and not one of them concerned in the slightest degree in the transactions they are called on to settle; transactions the most complicated, multifarious and entangled, that could grow out of a large estate, apparently involved to the full extent of its value. What chance, I ask, is there of arriving at justice in such a case ? Would it not have been better to send these parties out of court at once, than to keep them, as they have been already, twenty-six years in court, and then decide at hazard, or (what is more likely) send them back to continue the race ? It may be thought, however, that I have not represented the thing with exact fairness, in saying that the suit was not commenced till 1809, as the plaintiffs in their bill refer to a former bill filed by them, which is found in the record. I certainly did not mean to pass this matter by. The bill was filed in December 1797, by Hayes and wife and Claiborne and wife, nearly in the words of the subsequent bill, calling on Robert Goode the executor, and the representative of Southall, for a settlement of the executorship of W. Black. They answered promptly, SoutlialVs executor relying on the settlement which he had made, and Goode stating that Southall had settled—stating also the complicated nature of the business, but that he was willing to settle. These answers were filed early in 1798. In September 1798 an order for account was taken, and here the matter was suffered to sleep for eight years. In October 1806 the suit is entered abated as to Hayes by his death, and then dismissed for want of prosecution. Mark, there were four parties plaintiffs, and but one of them died; but the suit was abandoned by the rest, and dismissed. Could there be grosser negligence than this ? And is an abortion of this sort to be taken into the account of time ? Surely not. All this while, *486 Goode the executor, who had a personal knowledge of the matter, was alive: he had said that he was willing t0 sett^e> ar*d this promptness seems to have paralysed the other party. They stop short, abandon the suit: it is dismissed in 1806. Goode then is fully justified in supposing the pursuit relinquished. He dies in 1808, and the very next year it is renewed; as if they had only waited till all the actors in the scene had left the stage. In my mind they cannot claim the slightest advantage from this impotent and derelict proceeding. Their suit was never commenced to any purpose till 1809; for this was not á revival of the old suit, but a new and original bill. I repeat then, that twenty-seven years were suffered to pass away, and every agent in the administration to die, before the bill calling for a settlement was filed. And this under circumstances strongly calculated to awaken the attention and excite the vigilance of all interested in the estate. Such laches and neglect do, in my opinion, according to the settled rules of equity, close its doors against a suitor. “ Nothing,” says lord Camden, “ can call this court into activity, but conscience, good faith, and reasonable diligence; where these are wanting, the court is passive and does nothing.” For other cases upon this subject, I refer to Carr v. Chapman, 5 Leigh 164. Another objection arising from length of time, is the number of persons necessary to be made parties, and the consequent expensiveness of taking the account. La-con v. Briggs, 3 Atk. 105. Any one who will read the heading of this suit, and look upon the folio volume of 444 pages forming this record, must see at once that it has been very expensive: but perhaps a more striking view of this may be given by turning to page 23 of the record, where it will be seen that the chancellor has found it necessary, by a single order, to direct the settlement of fourteen administration accounts. How many more have been ordered in the *487 progress of the cause, 1 have not troubled myself to examine. “ It is a very sensible rule” (says the master of the rolls in Pickering v. Stamford) “ that parties shall not, by neglecting to bring forward their demands, put others to a state of inconvenience, subjecting them to insuperable difficulties. Against such a bill undoubtedly the court ought to set its face.” Again. “ If from the plaintiff’s lying by, it is impossible for the defendants to render the accounts he calls for, or it will subject them to great inconvenience, he must suffer: or the court will oppose what 1 think the best ground, public convenience.” But it is not only required that claims should be brought forward in reasonable time, but also that they shall be prosecuted with reasonable diligence. The case of Hercy v. Dinwoody, 2 Yes. jun. 87. is strong to this point. There a bill was filed by creditors (the most favoured class) for an account; it was filed recently, and answered; it remained in court with but few further proceedings; and thirty-three years after, the executors being dead, the bill was revived against their representatives and devisees. The master of the rolls refused the account and dismissed the bill. It was urged there, that the matter being in suit, and the defendants called on to account, they could not discharge themselves by a payment or settlement in pais, and therefore that this case was not open to the presumption applicable to others. The master of the rolls admitted this, but said—“For the reasons in Deloraine v. Browne, 3 Bro. G. C. 633. independent of the question of satisfaction, but on account of the very neglect, and the mischief and disturbance that may arise to families, though the presumption of satisfaction is not so strong, yet the laches and neglect may be such as to make it a matter of public policy that the party guilty of it shall abide by the consequences.” Twenty-seven years elapsed before the plaintiffs moved in this case: twenty-six have since passed while it has lingered on the docket. *488 Could this delay have taken place without the grossest negligence in the plaintiffs ? Impossible. But ex pede Herculem; let us look at the proceeding as to one of the defendants Samuel Goode one of the sureties of Robert Goode. He is made a defendant to the bill in 1809: his answer is sworn to in 1817 : and from this being done in the county of Mecklenburg, we may conclude that the place of his residence. He states (on oath) “that if he was the surety of Robert Goode as one of the executors of William Black the elder, it is a circumstance which had altogether escaped his recollection; nor was he ever directly or indirectly apprised of his situation as such, until the month of September 1815—an omission for which he cannot account, and one which he believes has deprived him of the means of substantiating many facts tending to elucidate the transactions of the executors ; and at this distance of time, after a lapse of between 30 and 40 years, he is compelled to rely for the most part upon a general exposition of the case” &c. Here we see that six years were suffered to elapse before the subpoena was served on this defendant; and a surety, thirty-three years after the death of the testator, is for the first time called upon to account for the disbursement of all the assets which came to the hands of the executors, under the penalty of paying whatever amount an industrious and ingenious commissioner can raise up against him, with an arrearage of interest stretching far beyond the principal. Is this doctrine to be tolerated? If so, what man of common prudence will ever consent to become a surety? This same defendant, although cut off by the lapse of time, and the death of all concerned, from the usual sources of evidence, has yet stated many circumstances tending to strengthen the presumption raised by time, that the executors have honestly disbursed the assets. Some of these I have stated in the early part of this opinion. I will only add one other. It is, the general impression *489 uf the. insolvency of the estate, prevailing at a time when every thing was fresh, and access easy to every source of evidence. This is very strongly proved by the conduct of various creditors, among whom may be mentioned Henderson, M’ Caul Sf Co. Turner Sf Son, Wallis Sf Bartlett, and Neil Jamieson Sf Co. who obtained judgments against the executors for large sums of money, which have either been paid and the proof lost (for there is none in the record) or are yet due. If paid, there can be no doubt that they would leave the executors creditors of the estate ; but if unpaid, how can we account for the fact that they have long since given up their debts and relinquished the pursuit ? Can we imagine that these lynx-eyed creditors would have failed to discover and avail themselves of any misconduct of the executors ? If there was any property of the estate accessible, would they not have levied upon it? If the executors had wasted or misapplied the assets, would they not have pursued them for devastavits? They were both men of fortune, and had given bond and security. I am of opinion then, for these reasons, that the dismission of the bills was right. In these views, I have considered all the bills and amended bills from 1809 to 1824, simply in the light of bills by the distributees of William Black the elder, calling upon the representatives of his executors and others for a settlement of the personal estate of the testator. In 1824, a bill of a different character was filed. It states that the devise to the grandson never vested : that by the will Mrs. Hayes took the Falls plantation as heir of her brother: that as to the slaves embraced by the seventh clause of the will, the testator died intestate, and submits whether, as to this property William Black the son, though the heir at law, was not excluded by the evident intention of the testator that he should not have any part of his estate. It, for the first time, makes Mrs. Wilson, the wife and devisee of William Black the son, a party; as also the *490 representative of Mrs. Garland, the daughter of William Blaclc senior by his last wife. The plaintiff Mrs. Hayes also, in this bill, for the first time, brings, forward a claim to be reimbursed out of the personal estate fot ^e money she paid on a mortgage of the Falls plantation, upon the ground that as she took that estate as a devisee, the personal estate of the testator, as well as the lands descended, was subject to be first taken in ease of the land devised. She therefore prays that whatever personal estate may be found unadministered, may be applied first to reimburse her the amount of this mortgage, and if there should be any surplus, that the rights of the parties to it may be settled. To this bill answers were filed by Mrs. Wilson and the representative of Mrs. Garland, submitting the claims of the plaintiffs to the decision of the court. With respect to these claims I will say, first, that the claim to reimbursement for the mortgage debt seems to me wholly unfounded. Indeed the staleness of it alone is enough for its rejection. In 1793, the bill was filed to foreclose this mort- ' gage, and the plaintiff stated that he had been informed the executor had no assets. The answer of Hayes and wife, I think, may be considered as admitting this. Then was the time, if they supposed that there were assets, and these liable to redeem the land, for them to have called the executor to their aid, and gotten a decree for such an application of the assets. But they did no such thing; they suffered a decree of foreclosure, sold the land, and paid the mortgage. And now, thirty years after, they put in this claim. It is clearly inadmissible. Next, as to the slaves embraced in the seventh clause: it is here first suggested that the testator died intestate as to them; 'and this I think is clearly so; but how this should avail the plaintiffs in a bill against the representatives of William Blade senior, and framed as these bills are, I cannot imagine. The bequests of the slaves failing, they descended “ as real estate, and *491 not chattels, to the heir at law, according to the manner and custom of land of inheritance held in fee simple.” These are the words of the act of 1705, 3 Hen. stat. at large, p. 333. which remained in force until 1787. Under this law, these slaves went to William Black the son, subject however to the debts of the testator. The act of 1705 directs that the slaves “ shall be inventoried and appraised, and the value thereof shall be equally divided among all the children; and the several proportions according to such valuation and appraisement, shall be paid by the heir (to whom the said slaves shall descend by virtue of this act) unto all and every the other said children.” And the act gives to each child the remedy of an action on the case against the heir, for their several proportions. This remedy is changed by the act of 1727, 4 Hen. stat. at large, p. 227. into a bill in equity against the heir. From these laws it seems to me, that the younger children of a person dying intestate have no claim on the personal representative, for their proportions of the value of the slaves descended. Their claim is given by the law; it is a statutory remedy, and the statute gives it exclusively against the heir and his representatives. On this ground I think the chancellor was right in his decree, in saying that the executors of William Black the elder were not accountable to the plaintiffs for the slaves.
I am for affirming the decree.
Cabell, J.
As to the questions on the construction of the will of William Black the elder, which were so laboriously and ably argued by the counsel on both sides, I do not deem it necessary to give any opinion. For, whatever may have been the rights of the complainants as against the executors of that will, I concur with the judges who have preceded me, in thinking them barred by the great length of time, which was permitted, without any sufficient excuse, to elapse before the institution *492 of this suit. Those who have so long failed to ask an account of transactions from the actors in those transactions, while the actoi'S themselves were yet living and able, to render a just and true account, ought not, on principles of public policy and private justice, to be permitted to exact it now, from those from whom no just and true account can be expected. The principles on which we decided the case of Carr’s adm’r &c. v. Chapman’s legatees, 5 Leigh 164. are applicable to and decisive of this case.
I am of opinion to affirm the decree dismissing the bill.
Tucker, P.
The first question to which it is necessary to respond in this case, respects the limitation in the will of William Black the elder to his grandson William Black the 3rd; and upon this subject I cannot concur wholly in the views of either party. I do not assent to the proposition of the defendants’ counsel that William Black the son took a life interest, which was enlarged into an estate in fee by the subsequent limitation to his right heirs, according to the rule in Shelley’s case. That rule can have no application, unless the ancestor takes an estate of freehold by the same conveyance which created the limitation to his heirs. But William Black the son took no estate under the will, the great object of which was obviously to exclude him from the inheritance. The testator devised the Falls plantation to trustees, with an express provision that the widow should work the whole of it; that she should have one half the profits during life or widowhood; that she should permit the son to live in the mansion house and be supported from the produce of the estate, and if they could not agree, then he was to be permitted to live separately and to have a support for himself and family, in kind or in money. This was indeed a charge upon the widow in respect to the estate given her for life, but *493 it was not an estate in the land given to the son. Neither was there any resulting trust for him, arising out of a failure to dispose of the whole beneficiary interest in the estate, or out of the widow’s renunciation of the will. The trusts are fully declared, and cover the whole estate. The whole estate is given to the widow during life or widowhood, subject to the charge already mentioned; and when she renounced, the last clause of the will but one came into operation, whereby the produce of the estate is devoted to the education of the children of the son, and the general benefit of his family, including the wife of the son, if she should survive him. I cannot, out of the will itself or the circumstances which have succeeded it, find any thing which will justify us in holding that William Black the son took a freehold estate. If he did not, then the limitation to his right heirs could only operate as an executory devise, and if it was good, Anne 'Dent Hayes the testator’s daughter and the only sister of the whole blood of William Black the son, took the Falls plantation as his right heir, upon the failure of the limitations to William Black the grandson.
Nor can I think with the counsel for the plaintiffs, that there was in this case either a vested feetail or a vested estate in fee simple in William Black the grandson, defeasible upon his dying without issue before he came to maturity. If there had been no trust created, and the devise had been immediate, there would have been strong reasons for giving one of these interpretations to this will. The cases which have been cited, from Boraston's case, 0 Rep. 19. to Goodtitle v. Whitby, 1 Burr. 228. and Hunt v. Moore, 14 East 601. would have been very strong authorities for construing the interest of the grandson as a vested estate. It would have been necessary, in order to prevent the overthrow of the testator’s intention in the event of the grandson dying under age leaving issue. Unless so construed, the issue could *494 not take, because the double contingency had not occurred, and those in remainder could not take because there was'not a dying without issue. But if, as I take it, this is an executory trust, these difficulties, will cease t0 exist, the necessity for such a construction will disappear, and the impossibility of the interest devised to the grandson being considered as vested will be perfectly obvious.
The distinction between an immediate devise or an executed trust, on the one hand, and an executory trust on the other, is familiar to the profession and perfectly well established by the cases. Mr. Fearne has collected them with much care (from page 114. to 148.) and has shewn that notwithstanding the remarks of lord Hardwiclce in Bagshaw v. Spencer, 2 Atk. 581. the distinction has been recognized and established beyond" controversy; and strongly as he was inclined to sustain the rule in Shelley’s case, he does not hesitate to admit that even that rule, unbending as it is, does not govern the case of executory trusts, but that they are always moulded according to the intention of the party by whom the trust has been created. In executed trusts however, and in imfnediate devises, the case is different, for in them the rule in Shelley’s case is imperative, if the requisitions of that rule are to be found in them; and as nothing is left to be done, the limitations executing themselves, there is no room left for a court of chancery to exercise its power in moulding them according to the supposed will of the testator.
In this indeed consists the distinction between executed and executory trusts. In the former, the estate passes without any act for its transfer being done by the trustee. In the latter, “the completion of the trust is referred to a conveyance or settlement directed to be made by the testator, in contradistinction to those trusts in which no such executory medium is referred to.” Fearne 137. According to this distinction, the devise *495 in this case clearly creates an executory trust. It is not an immediate devise to the grandson, nor a trust declared in his favour, without more saying. But it is a devise to trustees in fee, upon trust to convey to the grandson and his heirs, upon his arriving at maturity. It is a case in which “the completion of the trust is referred to a conveyance to be made by the trustees,” and that too upon the happening of an event which was altogether contingent. It was therefore, 1 conceive, an executory trust.
Considering it in this light, we are next to recollect that it is susceptible of being modelled according to the real intention and views of the testator, and that the trustees will be required by a court of equity to convey in accordance with that intention. What then is the true meaning of the will? First, it is clear that if William Blade the 3rd had attained the age of 21, he would have been entitled to a conveyance of the fee. Secondly, if he died under age and without issue, the conveyance was to be made according to the limitations over. Thirdly, if he died under age leaving issue, then the trust ought to be executed by a conveyance to such issue (?. e. the heir at law) in fee. For as the limitation over is only in the event of his dying without issue, it is obvious that the persons in remainder could not take if he left issue; and it is equally clear that as the testator directed the fee to be conveyed to the grandson if he attained the age of 21, and as he gives the estate over only in case of failure of issue, he must have designed to provide for the issue. Taking the clause together and expounding one part by the other, it is equivalent to a direction that the trustees should convey to the grandson in fee, if he attained 21; “ but if he died before 21, leaving issue, they should convey to such issue in fee.” Moulded thus, the testator’s intention is subserved, and every difficulty of construction is removed. The interpolation of these latter words is not only in strict conso *496 nance with the clear intent, but it is also demanded by it,, and is, I think, much less strong than the interpolafion in the case of Selden v. King, 2 Call 72.
We next come to consider whether, by this will, the grandson took a vested estate anteriour to his attaining the age of 21 years. Clearly not, I think. Considering this as the case of an executory trust, it seems conclusive of the question ,* for as has been well observed by an elementary writer, the notion of an executory interest is irreconcileable with the idea of a vested interest. 1 Prest, on Est. 64. A vested interest is where there is an immediate fixed right of present or future enjoyment. Fearne 2. Whereas an executory interest, ex vi termini, implies that something further is to be done for the completion of the trust, and the vesting an estate in the party. “ By a vested estate, in relation to interests of a freehold quality, is to be understood an interest clothed, as to legal estates, with a legal seisin, or, as to equitable estates, with an equitable seisin, which enables the person to whom the interest is limited, to exercise the right of present or future enjoyment immediately, in point of estate. A vested estate is an interest clothed with a present legal and existing right of alienation.” 1 Prest, on Est. 65. On the other hand an executory trust implies that something further is to be done before the party is “invested” with the estate; and until that is done, so far from his having a present legal and existing right of alienation, he has nothing to alienate. Thus in the present case, the grandson took no immediate estate by devise, postponed only as to the time of enjoyment, but the property was devised to trustees, to be by them conveyed to him upon the contingency of his attaining full age. He had then, and could have, no conveyance until the contingency happened. Until that happened, they were not bound to convey and could not lawfully convey to him, even if they wished to pass a title to him. His interest then was only an equitable *497 contingent interest, not a vested estate. If it was a vested legal estate, it must have been a vested fee simple, and the trust would then have become executed, instead of being executory. The conveyance to him after he attained his full age would have been unnecessary and inoperative, upon this supposition that an estate in fee vested in him immediately on the testator’s death. It may be said, indeed, that the estate vested in him was not the legal but the equitable estate, and that then the incongruity just insisted on is avoided. I do not think so. He had indeed a contingent equitable interest, but not an equitable estate. He had no equitable seisin of an estate of inheritance. For if he had such an equitable estate in fee, he might of consequence have at any time demanded of the trustees a conveyance of the legal title to him, even before he attained the age of 21. But this would have been,in direct conflict with the provisions of the will, and therefore could not be; whence I conclude that as he had not a right to demand a conveyance, he could not have a vested equitable estate in fee.
If I. am right in the view which I have taken of the limitations in this will, it is obvious that the lands never vested in the grandson, and of course the slaves mentioned in the seventh clause did not pass to him, since the trust of them was only declared in favour of such son of William Blade the 2nd as should take the land. If so, William Blade the elder, in the event that has happened, died intestate as to these slaves, and William Bla,dc the son became entitled to them, subject to the charge of paying due proportions to his two sisters, according to the then existing law. And had the executors delivered over these slaves to the son, the complainants could only have looked to his representatives. But as they did not;—as they sold the slaves, and have the proceeds in their own hands, they are liable to the demand of the plaintiff Anne for her portion of them, if *498 indeed any thing was left after payment of the testator’s debts. Whether, as the slaves were real estate, the sureties would be irresponsible for the waste of them (according to the case of Jones v. Hobson, 2 Rand. 483.) I do not mean to decide.
Upon this ground therefore, and upon her title to distribution, Mrs. Hayes had an undoubted right to come into a court of equity for an account. But it is contended that this right has been lost by her laches. Let us consider this matter, as it relates to the two executors, Goode and Southall, distinctly.
First as to Goode: I think there has been no such negligence as will bar the rights of the plaintiffs. Anteriour to May 1798, Hayes and wife and Claiborne and wife filed their bill against Goode and Turner Southall's administrator, calling for an account. Goode, who was then living, answered, and submitted to account. At this time the charge of laches was not made, nor could it have been sustained. The lapse of time had not been such as to bar the assertion of the plaintiffs’ pretensions, according to the decisions of this court. The suit remained on the docket till 1806, and then abating by Hayes's death, was dismissed for want of prosecution on the part of his widow. In 1809, however, it was revived by her, and she states in her bill that she was ignorant of the fact of dismission. I think it would be hard measure to bar the rights of a feme covert under such circumstances, she having renewed the assertion of them in about two years and an half after the abatement of her husband’s suit by his death. From this time the suit has been regularly prosecuted, and though the great lapse of time since its commencement may be a motive for less rigour in scrutinizing the accounts, and may furnish some apology for defect of evidence in support of executorial transactions, yet it can have no influence upon the question of the right to sustain the present bill. That right, as to Goode's representatives, I think unquestionable.
*499 It is not less so as to Southall. His executorial transactions were settled indeed after his death, in 1792, before the county court. The suit to enforce a settlement in equity was commenced only six years after, and though it was abated by Hayes’s death in 1806, it was renewed by his widow in 1809. With the strongest disposition to resist the assertion of stale demands, and particularly the ripping up of executorial transactions after a groat lapse of time, I cannot think that this case can properly be considered as falling under that censure. A great number of years have indeed elapsed since the death of the testator, but thirty-eight of the years that have rolled away have found this matter depending in the courts. They must be excluded, therefore, from our computation, and then the case stands thus : that the distributee has instituted her suit within fifteen years from the testator’s death, against one executor who has never settled his accounts before the court of probate, and who, upon being sued, assented to account; and against the representatives of another, who had never settled his accounts in his lifetime, and whose accounts were only settled by his administrator within six years anteriour to the filing of the bill.' These circumstances do not constitute such laches, in my judgment, as to exclude the plaintiff Anne from a right to call for her distributable portion of her father’s estate from his executors, who have never fully and fairly settled it up.
With respect, however, to the claim to relieve the Falls plantation from the mortgage debt, by refunding what has been paid by the devisee of that estate, I am clearly of opinion that the pretension is too stale to be now enforced. The claim is for the first time asserted by the amended bill of 1824, about twenty-six years after the discharge of the mortgage by Mrs. Hayes and her husband. This is too late.
From the preceding succinct view of this case, it seems to me that the bill of the complainants should *500 not have been dismissed, but that the court of chancery should have proceeded in the cause to a final decree, according to the principles of the court. Upon looking into the accounts, 1 think it would be hazardous in us to attempt to settle the amount which is due. All that can properly be done by this court is to intimate its opinion upon some points which are presented by the accounts and the evidence taken in the cause. In the discharge of this duty, I will observe that in deciding upon the responsibility of the executors for losses by alleged insolvency, it is reasonable, after so great a lapse of time, that the omis probandi should be thrown upon the party affirming the solvency, since the presumption is that the executors would not have failed to collect the debts of the estate in any case in which the party was able to make payment:—That in those cases where the executors are responsible, they ought not to be charged with interest upon the lost debts :—That as to the supposed outstanding demands against the estate, which have probably been abandoned as hopeless and are barred by the statute of limitations, the executors are not entitled to retain the assets on account of them, but are only entitled to refunding bonds, indemnifying them against these and all other claims which may hereafter be successfully asserted :—That the settlement of Turner Southall’s administrator is only to be taken as prima facie evidence of the matters it sets forth, but that it is not evidence of any matters not appearing upon it, and is moreover liable to be rebutted by other testimony:—And that the executors were not, under the will of William Black the elder, authorized to apply the general assets to the support and maintenance of his son and his son’s family, to the detriment of the other distributees. With these instructions, I am of opinion to reverse the decree and send the cause back for further proceedings.
Decree affirmed.